IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NELSON RIVERA,                  :
   Plaintiff                    :
                             :     No. 1:21-cv-41
   v.                           :
                             :     (Judge Rambo)
JOHN WETZEL, *et al.*,          :
   Defendants                   :

## <u>MEMORANDUM</u>

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983 that is before the court on Defendants' motions for summary judgment. For the reasons that follow, the motions will be granted. The court will also grant summary judgment to the non-moving Defendants *sua sponte*.

## I.     BACKGROUND

On January 11, 2021, *pro se* Plaintiff Nelson Rivera ("Rivera") filed a complaint pursuant to 42 U.S.C. § 1983 alleging civil rights violations during his incarceration in Mahanoy State Correctional Institution ("SCI-Mahanoy") and Smithfield State Correctional Institution ("SCI-Smithfield"). (Doc. No. 1.) The case is currently proceeding on Rivera's second amended complaint, filed on December 9, 2021. (Doc. No. 68.) Defendants moved to dismiss the second amended complaint on December 30, 2021, but the court deemed the motion withdrawn for failure to file a supporting brief on March 1, 2022. (Doc. No. 76.)

Rivera moved for leave to amend his complaint on April 25, 2022, seeking to add factual allegations indicating that he was released from DOC custody on February 16, 2022, and that he was therefore no longer required to exhaust administrative remedies prior to filing suit.  (Doc. No. 81.)  The court agreed with Rivera that when a plaintiff is released from prison and subsequently files an amended complaint, the amended complaint is no longer subject to the Prison Litigation Reform Act ("PLRA")'s administrative exhaustion requirement.  (Doc. No. 84 at 2 (citing *Garrett v. Wexford Health*, 93 F.3d 69, 84 (3d Cir. 2019)).) Nevertheless, the court denied the motion for leave to amend without prejudice, finding that the motion did not present any basis for amending the complaint other than Rivera's desire to defeat the possible defense of failure to exhaust administrative remedies and that this was not a proper basis to amend a complaint. *Id.*  Rivera did not submit any subsequent requests to amend his complaint.

Following the close of fact discovery, defendants Carodiskey, Cronauer, and Damore moved for summary judgment on February 14, 2023.  (Doc. No. 89.) Defendants Bowes, Clouser, and Goss moved for summary judgment on the same day.  (Doc. No. 92.)  Defendants seek summary judgment because Rivera failed to exhaust administrative remedies, because his claims fail on the merits, and because they are entitled to qualified immunity.  The court extended the deadline for Rivera to respond to the motions to April 7, 2023, (Doc. No. 96), but Rivera neither

responded to the motions by that date nor requested an additional extension of time in which to do so.  The motions are thus ripe for review.  Defendant Kabilco and the three John Doe Defendants have not been served with process and have not responded to Rivera's second amended complaint.

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  To avoid summary judgment, however, the nonmoving party may not rest on the allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like to demonstrate specific material facts which give rise to a genuine issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59. In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried." If the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." M.D. Pa. L.R. 56.1. A party cannot evade these litigation responsibilities simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (noting that *pro se* parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

### B.    Civil Rights Statute, 42 U.S.C. § 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. *See* 42 U.S.C. § 1983. The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

5

> subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." *See Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002)). To state a cause of action under Section 1983, a plaintiff must allege that: (1) the conduct complained of was committed by persons acting under color of state law; and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005).

## III.   STATEMENT OF MATERIAL FACTS[1]

During his underlying criminal trial, Rivera testified against several of his co-defendants. (Doc. No. 90 ¶¶ 5-6.) Rivera was subsequently sentenced to a term of imprisonment, which resulted in him entering SCI-Mahanoy on December 9, 2019. (*See id.* ¶ 8.) Rivera did not know whether any of his co-defendants were in

---

[1] Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statements of facts. (Doc. Nos. 90, 93.) Rivera has not filed a responsive statement to Defendants' statements. Accordingly, unless otherwise noted, the court deems the facts set forth by Defendants to be undisputed. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1; *United States v. Alberto*, No. 3:18-cv-1014, 2020 WL 730316, at *2 (M.D. Pa. Feb. 13, 2020) (concluding that the "[f]ailure to file this [responsive statement of material facts] results in admission of the moving party's statement of facts").

SCI-Mahanoy at that time, but he requested that Defendants Damore, Carodiskey, and Cronauer keep him separated from those individuals and their associates. (*Id.* ¶¶ 9, 12.)  At the time he spoke with the Defendants, Rivera had not been threatened by anybody regarding his testimony. (*Id.* ¶ 16.)

Rivera spoke with security officials on December 13, 2019. (*Id.* ¶ 17.) Rivera told the officials that he had testified against his co-defendants and that he believed he was in danger in SCI-Mahanoy because of that testimony. (*Id.* ¶ 18.)

Rivera was transferred to the prison's general population on December 17, 2019. (*Id.* ¶ 23.)  Later that day, an unknown inmate approached him, asked him if he was Nelson Rivera, and asked him, "Ain't you the guy who told on Goldo?", which Rivera interpreted as a reference to one of his co-defendants. (*Id.* ¶¶ 24-27.) Rivera perceived this statement as a threat, but he did not receive any further threats from the unknown inmate after that interaction. (*Id.* ¶¶ 28-29.)

Rivera was transferred to the Restricted Housing Unit ("RHU") after receiving a misconduct charge. (*Id.* ¶ 30.)  While in the RHU, he was placed in a cell with Jeffrey Burgos. (*Id.* ¶ 31.)  Burgos was not one of Rivera's co-defendants and was not an associate of the co-defendants. (*Id.* ¶ 32.)  Burgos neither threatened nor assaulted Rivera during their time as cellmates. (*Id.* ¶¶ 33-34.)

Rivera was transferred to SCI-Smithfield on March 31, 2020. (Doc. No. 93 ¶ 9.)  At the time of his transfer, the institution was on lockdown due to the

COVID-19 pandemic.  (*Id.* ¶ 10.)  Rivera spoke to officials at the prison shortly after his transfer about the possible danger he faced from his co-defendants.  (*Id.* ¶ 13.)  The security officials acknowledged that one of the co-defendants, Roberto Ortiz, was in the prison, but stated he was on the other side of the prison and that they likely would not see each other due to lockdown conditions.  (*Id.* ¶ 15.)

Rivera was placed in I-Unit in SCI-Smithfield.  (*Id.* ¶ 19.)  Another of his co-defendants, Theodore Thomas, was housed in the adjacent unit.  (*Id.*)  During his incarceration on I-Unit, Ortiz allegedly delivered Rivera's lunch tray on one occasion and called him a "fucking rat."  (*Id.* ¶ 22.)  Ortiz's friends in the prison also allegedly called Rivera a "rat" on several occasions.  (*Id.* ¶ 23.)  Rivera told correctional officer Webb about his interaction with Ortiz and the fact that he had testified against Ortiz.  (*Id.* ¶ 24.)  Rivera requested that prison officials no longer allow Oritz to deliver lunch trays to Rivera's unit.  (*Id.*)  Officials granted this request and ceased allowing Ortiz to deliver the trays.  (*Id.* ¶ 25.)  Rivera saw Ortiz one other time during his incarceration at SCI-Smithfield.  (*Id.* ¶ 26.)  Ortiz gave him a "salty look" and an "angry look," but did not say anything to him.  (*Id.* ¶ 27.)

After some COVID-19 restrictions were lifted, Rivera saw Thomas in the recreation yard on May 27, 2020.  (*Id.* ¶ 29.)  Thomas did not threaten Rivera.  (*Id.* ¶ 31.)  Rivera immediately went inside and reported the incident to his unit manager, who arranged to have him transferred to the RHU.  (*Id.* ¶¶ 30, 32.)

Upon his transfer to the RHU, Rivera was housed with two individuals from Reading, Pennsylvania.  (*Id.* ¶ 34.)  Because the crime for which Rivera and his co-defendants were convicted occurred in Reading, Rivera speculated that his two cellmates may have known his co-defendants.  (*Id.* ¶ 36.)  Neither of the cellmates threatened or attacked Rivera.  (*Id.* ¶ 37.)

Beginning on August 4, 2020, Rivera was housed with inmate Andy Vangelli in the RHU.  (*Id.* ¶ 42.)  Vangelli was not one of Rivera's co-defendants or an associate of the co-defendants.  (*Id.* ¶ 45.)  Rivera and Vangelli had a physical altercation on August 4, 2020, following Rivera's discovery that Vangelli had eaten his bacon.  (*Id.* ¶¶ 48-49.)  Rivera reported the incident to Defendants Clouser and Bowes, who did not respond.  (Doc. No. 93-2 at 88-89.)

Rivera suffered minor injuries to his neck and leg during the altercation with Vangelli.  (*Id.* ¶¶ 60-61.)  Prior to the altercation, Vangelli and Rivera had not had any incidents and Rivera had not reported to staff that he felt unsafe sharing a cell with Vangelli.  (Doc. No. 93 ¶¶ 57, 59.)

Rivera filed a grievance against Bowes and Clouser regarding the incident with Vangelli in August 2020.  (*See* Doc. 1-1 at 6-7.)  The grievance was denied on August 12, 2020.  (*Id.* at 7.)  Rivera appealed the grievance through all stages of administrative review but was denied relief.  (*Id.* at 8-16.)

Rivera filed two grievances on August 19, 2020, which were assigned

grievance numbers 884509 and 884516.  (*See* Doc. 1-1 at 21, 29.)  Both grievances were rejected as submitted to the wrong facility, with officials determining that Grievance Number 884509 had to be filed at SCI-Forrest and that Grievance Number 884516 had to be filed at SCI-Mahanoy.  (*Id.* at 23, 30.)  Rivera appealed the rejection of his grievances but was denied relief.  (*See id.* at 24-27, 31-34.)

Following the rejection of his initial grievances, Rivera filed two new grievances regarding the same allegations on August 27, 2020.  (*See id.* at 36, 43.) The new grievances were assigned grievance numbers 887202 and 887205.[2]  (*Id.*) Grievance Number 887202 was rejected as untimely.  (*Id.* at 37.)  Rivera appealed the rejection, but he was denied relief.  (*Id.* at 38-41.)  Grievance Number 887205 was also rejected on procedural grounds.  (*Id.* at 45.)  Rivera appealed the rejection but was denied relief.  (*Id.* at 47-49.)

## IV.  DISCUSSION

### A.    Exhaustion

Pursuant to the Prison Litigation Reform Act ("PLRA"), a prisoner must pursue all available avenues of relief through the applicable grievance system before initiating a federal civil rights action.  *See* 42 U.S.C. § 1997e(a); *Booth v.*

---

[2] Defendants assert that other than Grievance Numbers 887202 and 887205, Rivera "did not file any other inmate grievance concerning his claims asserted against SCI Mahanoy Defendants." (Doc. No. 90 ¶ 40.)  This appears to be untrue.  Grievance Numbers 884509 and 884516 were filed earlier than those grievances and concerned the same facts.  These grievances are attached as exhibits to Rivera's original complaint, (*see* Doc. No. 1-1), and are considered as part of the record of this case for the purpose of resolving the instant motions for summary judgment.

*Churner*, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."). Section 1997e provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007).

The PLRA requires proper exhaustion, meaning plaintiffs must exhaust their claims in accordance with the procedural rules of the prison where they are incarcerated. *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). Failure to exhaust is an affirmative defense that defendants must plead and prove; it is not a pleading requirement for plaintiffs. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

The Third Circuit has further provided that there is no futility exception to Section 1997e's exhaustion requirement. *Nyhuis v. Reno*, 204 F.3d 65, 75-76 (3d Cir. 2000). Courts have typically required across-the-board exhaustion by inmates seeking to pursue claims in federal court. *Id.* Additionally, courts have interpreted this exhaustion requirement as including a procedural default component, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding with a claim in federal court. *See Spruill v.*

11

*Gillis*, 372 F.3d 218 (3d Cir. 2004).  Courts have also concluded that inmates who fail to complete the prison grievance process in a full and timely manner are barred from subsequently litigating claims in federal court.  *See, e.g., Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008).

This broad rule favoring full exhaustion allows for a narrowly defined exception; if the actions of prison officials directly caused the inmate's procedural default as to a grievance, the inmate will not be required to comply strictly with this exhaustion requirement.  *See Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000).  However, courts also recognize a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires."  *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," *Harris v. Armstrong*, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate."  *Warman*, 49 F. App'x at 368.  In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently reject inmate requests for their failure to exhaust to be excused.  An inmate, therefore, may not excuse a failure to comply with these

grievance procedures in a timely manner by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. *See Harris*, 149 F. App'x at 59. Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him. *See Warman*, 49 F. App'x at 368. Consequently, an inmate's confusion does not, alone, excuse a failure to exhaust. *See Casey v. Smith*, 71 F. App'x 916 (3d Cir. 2003).

In certain circumstances, administrative remedies may be considered unavailable to an inmate such that a failure to exhaust may be excused. *Ross v. Blake*, 578 U.S. 632 (2016). The *Ross* Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, an administrative procedure is not available when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, a procedure is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. The burden is on the plaintiff to show that administrative remedies were unavailable to him. *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).

13

The DOC's grievance policy, DC-ADM 804, requires a prisoner to first submit a timely written grievance for review by the Superintendent or regional grievance coordinator within fifteen days from the date of the incident in question. DC-ADM 804, Department of Corrections, available at https://www.cor.pa.gov /About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf. DC-ADM 804 provides that the grievance must include "a statement of the facts relevant to the claim," "shall identify individuals directly involved in the events," and "shall specifically state any claims [the inmate] wishes to make concerning violations of Department directives, regulations, court orders, or other law." *Id.* If the inmate wishes to receive compensation or "other legal relief normally available from a court" as a remedy for his grievance, he "must request the specific relief sought in his/her initial grievance." *Id.* A response should be received within ten business days. *Id.* Next, the prisoner must submit a timely written appeal to an intermediate review level within ten working days. *Id.* Again, a response should be received within ten working days. *Id.* Finally, the inmate must submit a timely appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days, and the inmate should receive a final determination within thirty days. *Id.* To fully exhaust an issue or incident in accordance with DC-ADM 804, "[a]n inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process." *Stroman v.*

*Wetzel*, No. 1:16-CV-02543, 2019 WL 931653, at *3 M.D. Pa. Feb. 26, 2019); *see also Garcia v. Kimmell*, 381 F. App'x 211, 213 n.1 (3d Cir. 2010) ("Proper exhaustion in Pennsylvania requires completion of a three-part procedure; initial review, appeal, and final review.").

Defendants Carodiskey, Cronauer, and Damore argue that Rivera failed to exhaust his administrative remedies with respect to the claims against them because Grievance Numbers 887202 and 887205 were not filed within fifteen working days of the events being grieved as required by DC-ADM 804.  (Doc. No. 91 at 7-8.)

The court agrees that Rivera failed to exhaust administrative remedies with respect to Grievance Numbers 887202 and 887205.  Both grievances were rejected as untimely during the administrative process.  (*See* Doc. No. 1-1 at 37, 49.) Rivera accordingly did not properly exhaust the claims.  *See Downey*, 968 F.3d at 305 (noting that plaintiffs must comply with prison's procedural rules to exhaust administrative remedies).

Defendants Carodiskey, Cronauer, and Damore overlook Grievance Number 884509 and 884516 in stating that Grievance Numbers 887202 and 887205 are the only grievances Rivera filed with respect to the claims arising from his incarceration in SCI-Mahanoy.  (*See* Doc. No. 90 ¶ 40.)  Nevertheless, the court has reviewed Grievance Numbers 884509 and 884516 and concludes that Rivera

15

also failed to exhaust administrative remedies with respect to these grievances. Both grievances were filed in SCI-Smithfield and rejected as filed in the wrong institution.  (*See* Doc. No. 1-1 at 23, 30.)  DC-ADM 804 requires grievances to "be filed with the Facility Grievance Coordinator/designee at the facility where the grievance event occurred," *see* DC-ADM 804, *supra*, and Rivera has accordingly failed to properly exhaust the grievances.  *See Downey*, 968 F.3d at 305.  The court will therefore grant summary judgment to Defendants Carodiskey, Cronauer, and Damore on the basis of failure to exhaust administrative remedies.

Defendants Bowes, Clouser, and Goss also seek summary judgment on the basis of failure to exhaust as to Rivera's claims arising from his incarceration in SCI-Smithfield.  (Doc. No. 94 at 9-12.)  They argue that Rivera failed to mention Goss in the grievance and failed to seek monetary relief.  (*Id.*)

With respect to Defendant Goss, Defendants are correct.  Rivera filed only one grievance with respect to his claims arising from his incarceration in SCI-Smithfield, Grievance Number 882379, and the grievance does not mention Goss or state in any way how he was responsible for Rivera's injuries.  (*See* Doc. No. 93-3 at 2-3.)  Goss will therefore be granted summary judgment.

Defendants are incorrect, however, that Grievance Number 882379 fails to seek monetary relief.  The grievance clearly states that Rivera is "seeking a relief of ($100,000) [one] hundred thousand dollars because no CO1 was concerned for

my safety or investigated the matter [and] denied me a sergeant [or] lieutenant."
(*Id.* at 3.)

The court concludes that Rivera exhausted administrative remedies with
respect to Grievance Number 882379.  The record shows that Rivera appealed the
grievance through all stages of administrative review and complied with the
DOC's procedural requirements.  (*See* Doc. No. 1-1 at 5-16.)

The court additionally concludes that no grievances other than Grievance
Number 882379 have been exhausted.  The other four grievances analyzed above
were all rejected for failure to comply with the DOC's procedural rules, and Rivera
concedes in his second amended complaint that these four grievances and
Grievance Number 882379 are the only grievances relevant to his claims.  (*See*
Doc. No. 68 ¶ 57 ("Plaintiff has included *complete* copies of the filings
surrounding the instances grieved in the claims herein." (emphasis added)).)  Thus,
because Defendants Bowes and Clouser are the only Defendants named in
Grievance Number 882379, (*see* Doc. No. 93-3 at 2-3), the court's analysis will
proceed to the merits only as to those two Defendants.

All other Defendants, including the four who have not been served with
process, will be granted summary judgment for failure to exhaust administrative
remedies.  Although a court must ordinarily give notice that it intends to grant
summary judgment in favor of a non-moving party, the court may *sua sponte* grant

summary judgment without advance notice when there is a fully developed record, the party against whom summary judgment is sought would not be prejudiced by the ruling, and the ruling is on a purely legal issue. *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004). That is exactly the case here: the record is fully developed on the issue of exhaustion, Rivera is not prejudiced by the court raising the issue *sua sponte* since the same result would inevitably follow if the court gave advance notice, and the ruling is a purely legal question given that there are no issues of material fact as to whether Rivera exhausted administrative remedies. Accordingly, summary judgment will be granted in favor of all Defendants other than Bowes and Clouser for Rivera's failure to exhaust administrative remedies.

### B.     Merits

Rivera's claims against Defendants Bowes and Clouser arise from their alleged failure to respond after Rivera's physical altercation with Vangelli. (Doc. No. 68 at 8-9.) Rivera alleges that Defendants' failure to respond constituted cruel and punishment in violation of the Eighth Amendment and violated his rights to due process and equal protection under the Fourteenth Amendment. (*Id.* at 9.)

It is somewhat unclear what theory of liability Rivera advances under the Eighth Amendment, but the court liberally construes the second amended

complaint as alleging that Bowes and Clouser were deliberately indifferent to the risk that Vangelli would assault him.

This deliberate indifference claim fails.  To prove that defendants were deliberately indifferent to an inmate's health or safety, a plaintiff must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the defendant was deliberately indifferent to that risk, and (3) the defendant's deliberate indifference caused the plaintiff harm.  *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)), *abrogated in nonrelevant part as recognized by Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020).  The first element is an objective inquiry of whether the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *See Beers-Capitol v. Wetzel*, 256 F.3d 120, 132 (3d Cir. 2001).  The second element is subjective: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  *See Bistrian*, 696 F.3d at 367 (quoting *Beers-Capitol*, 256 F.3d at 125).

When the plaintiff's deliberate indifference claim is based on the risk of an assault by another inmate, the plaintiff must show that defendants were aware of a risk that the other inmate would assault the plaintiff specifically, and not simply inmates generally.  *See id.* at 371.  By itself, the risk that an inmate with a history of violence will attack another inmate for some unknown reason is too speculative

19

to support an Eighth Amendment claim.  *See id.*; *accord Blackstone v. Thompson*,

568 F. App'x 82, 84 (3d Cir. 2014).

Here, Rivera has not adduced any evidence that he informed Defendants

Bowes and Clouser of a risk that Vangelli would assault him prior to the inmates'

altercation.  To the contrary, Rivera alleges that he did not tell Bowes and Clouser

about the altercation until after it had already occurred.  (*See* Doc. No. 68 ¶¶ 45-

46.)  Rivera has accordingly failed to show that Bowes and Clouser were aware of

a risk that he would be assaulted by Vangelli.

No other theories of liability under the Eighth Amendment suffice for

Rivera's Eighth Amendment claim to survive summary judgment.  There is no

allegation that Bowes or Clouser used any physical force against Rivera or

otherwise allowed him to suffer physical harm.  There is also no allegation that

Bowes and Clouser denied him medical care after the altercation with Vangelli,

and even if there were such an allegation, Rivera's minor injuries are not sufficient

to prove a serious medical need.  *See, e.g.*, *Natale v. Camden Cnty. Corr. Facility*,

318 F.3d 575, 582 (3d Cir. 2003) (noting that claims of deliberate indifference to a

serious medical need require a showing of a serious medical need and deliberate

indifference to that need (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir.

1999))).  The court will accordingly grant summary judgment as to the Eighth

Amendment claim.

20

Defendants will also be granted summary judgment as to the due process claim because it is duplicative of Rivera's Eighth Amendment deliberate indifference claim and therefore must be analyzed under the specific provisions of the Eighth Amendment rather than the more generalized notion of substantive due process. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.); *Graham v. Connor*, 490 U.S. 386, 395 (1989). Finally, the court will grant summary judgment as to the equal protection claim because Rivera has not alleged that he was treated differently from any similarly situated individual. *See, e.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (stating that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike" (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982))).

## V.    CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment (Doc. Nos. 89, 92) will be granted. An appropriate order follows.


s/ Sylvia H. Rambo
United States District Judge

Dated: July 17, 2023